## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**JOHN N. KANGETHE,**

    **Plaintiff,**

          **v.**                                     **Civil Action No. 11-2209 (JDB)**

**DISTRICT OF COLUMBIA,**

    **Defendant.**

## MEMORANDUM OPINION

John Kangethe, an economist for the District of Columbia government, has applied for an array of promotions over the past few years. He has been unsuccessful in them all. Kangethe ascribes this outcome to racism and ageism, and complains of a deteriorating work environment that he believes is rooted in retaliation. The District, however, has proffered valid explanations for its actions, and hence merits summary judgment on Kangethe's claims.

## BACKGROUND

John Kangethe, a man of Kenyan origin in his sixties, has been employed as a labor economist by the District of Columbia's Department of Employment Services ("DOES") since 2002. Over the years, DOES has experienced considerable turnover, resulting in a number of vacant positions. In May 2008, Kangethe temporarily filled one of those positions: Labor Market Information Acting Chief, an informal designation. See Ex. A to Def.'s Mot. Summ. J. [ECF No. 49-1] at 3. This position was formalized as a temporary promotion to Supervisory Labor Economist in August 2009. The temporary promotion included a pay raise but, from the beginning, both the position and the raise were set to expire in three months. See id. at 15.

In the meantime, DOES was advertising for a permanent Supervisory Labor Economist.

1

Kangethe applied to the first and third postings of that position (posting Nos. 10572 and 13183), but not the second (No. 11294).  The third posting attracted only four applicants, and only Kangethe was qualified for the position.  <u>See</u> Ex. S to Pl.'s Opp'n to Def.'s Mot. Summ. J. [ECF No. 51-6] at 46.  But he was not hired—nor was anyone else.  Then-director of DOES Joseph Walsh explained that he did not want to fill any position that did not have a larger pool of applicants.  <u>See</u> Ex. C to Def.'s Mot. Summ. J. [ECF No. 49-3] at 6–7.

Kangethe's quest for a promotion, however, continued.  In the spring of 2011, he applied to be the Associate Director for Labor Market and Workforce Research and Analysis (No. 17538).  That position was cancelled, and later reposted (No. 18016) with a requirement of five years' specialized experience in supervisory or project coordination—a requirement, according to HR, that Kangethe did not meet.  <u>See</u> Ex. A at 104.  When that search failed to produce a hire, the position was posted once more (No. 19401).  Kangethe applied for that position, too, but only after Ilia Rainer had already accepted an offer.  <u>Compare</u> Ex. P to Pl.'s Opp'n [ECF No. 51-5] at 8 <u>with</u> <u>id.</u> at 15.

Frustrated with his inability to secure a promotion, Kangethe had long since initiated the EEOC administrative process.  Failing to obtain relief through the EEOC, Kangethe filed a complaint against DOES.  He argued both that DOES failed to hire him for these positions, and that DOES retaliated against him because of his complaints (by demoting him from his temporary position, and disciplining him for failing to complete his work as requested), which he believes amounted to a hostile work environment.  As DOES is not a suable entity, the Court permitted Kangethe to file an amended complaint against the District of Columbia.  Sept. 18, 2012 Mem. Op. & Order [ECF No. 22] at 5.  He did so, asserting claims under Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act of 1967, and the Equal Pay Act.  On motion by the District, the Court dismissed the Equal Pay Act claims, but permitted the

rest of Kangethe's claims to proceed.  July 15, 2013 Mem. Op. [ECF No. 33].  Following full

discovery, the District and Kangethe have now each moved for summary judgment.

## LEGAL STANDARD

Summary judgment is appropriate where "there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  To

demonstrate such an issue, a non-moving party must put forth more than the "mere existence of a

scintilla of evidence" to support its position.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252

(1986).  Indeed, "[b]y pointing to the absence of evidence proffered by the non-moving party, a

moving party may succeed on summary judgment."  Lester v. Natsios, 290 F. Supp. 2d 11, 20

(D.D.C. 2003) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)).  And "[i]f the

evidence is merely colorable, or is not significantly probative, summary judgment may be

granted."  Anderson, 477 U.S. at 249–50 (internal citations omitted).

## DISCUSSION

As an initial matter, the Court can readily deny Kangethe's cross-motion for summary

judgment.  In his motion, Kangethe repeatedly states that a juror "could" conclude that his

travails were the result of discrimination, or that facts "could" support such an inference.  See,

e.g., Pl.'s Cross-Mot. Summ. J. [ECF No. 53] at 9, 23, 25, 29, 30, 39, 41.  But of course summary

judgment requires more: that a jury must conclude in his favor.  Even Kangethe admits that his is

not an open-and-shut case.  Therefore, he is not entitled to summary judgment.

## I.    TIMELY FILING

Kangethe is not entitled to a trial, either, though that requires a bit more explanation.  The

District's first line of defense is a non-starter.  Well after the Court declined most of its motion to

dismiss, and well after discovery ended, the District concluded that Kangethe had failed to timely

file his complaint, and that the entire process was a wash.  Despite the delay in raising this issue,

the District has not waived it.  See Fed. R. Civ. P. 12(h)(2)(B); see also Gordon v. Nat'l Youth Work Alliance, 675 F.2d 356, 360 (D.C. Cir. 1982) (construing statute of limitations argument as a 12(b)(6) issue).

The District points out, correctly, that Kangethe initially sued the wrong entity: DOES itself, rather than the District.  The District also points out—again, correctly—that Kangethe's amended complaint was served after the time to file had expired.  Because the complaint does not relate back, the District argues, the complaint is time-barred.

As a general matter, however, amendments changing the name of the defendant relate back to the date of the original complaint when the new party "received such notice of the action that it will not be prejudiced in defending on the merits" and "knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity."  Fed. R. Civ. P. 15(c)(1)(C).  In arguing that it was not apprised of the action, the District relies on cases wholly distinguishable from the facts here.  For instance, the D.C. Court of Appeals reasonably noted the importance of notice to the Corporation Counsel: "Mailing of the summons and complaint to a hospital at an intersection in southeast Washington, D.C. provided the District with no more notice than would have been effected by serving a clerk at the Department of Sanitation or a police officer at the Fourth District."  Arrington v. District of Columbia, 673 A.2d 674, 681 (D.C. 1996).  But Kangethe mailed even his first complaint to the Attorney General's office—the current incarnation of the Corporation Counsel, and a far cry from a police officer walking his beat.  And that office has represented the defendant in this case continuously since it was filed naming DOES.  Relation back is therefore appropriate here.

## II.     FAILURE TO HIRE

As to the merits: Kangethe's claims—and the extent of their factual support—must be analyzed under the familiar McDonnell Douglas burden-shifting framework.  See Cuddy v.

Carmen, 694 F.2d 853, 856–57 (D.C. Cir. 1982) (applying McDonnell Douglas to ADEA claims). "The complainant in a Title VII [case] must carry the initial burden . . . of establishing a prima facie case of racial discrimination.  This may be done by showing (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications." McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).  This formula, however, is not rigid.  Put more generally, a plaintiff states a prima facie case "by establishing that: (1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination." Stella v. Mineta, 284 F.3d 135, 145 (D.C. Cir. 2002) (internal quotation marks omitted).

If the plaintiff is able to establish a prima facie case, "[t]he burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection." McDonnell Douglas, 411 U.S. at 802.  And if the employer does so, the burden shifts yet again, requiring the plaintiff to demonstrate that the employer's "stated reason . . . was in fact pretext." Id. at 804.  At this point, "the focus of proceedings . . . will be on whether the jury could infer discrimination from the combination of (1) the plaintiff's prima facie case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff (such as independent evidence of discriminatory statements or attitudes on the part of the employer) or any contrary evidence that may be available to the employer (such as evidence of a strong track record in equal opportunity employment)." Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1289 (D.C. Cir. 1998) (en banc).

But, as the Court of Appeals has instructed, "where an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision, the district court need not—and should not—decide whether the plaintiff actually made out a prima facie case under McDonnell Douglas." Brady v. Office of the Sergeant at Arms, 520 F.3d 490, 494 (D.C. Cir. 2008). The case is reduced, then, to "one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin?" Id. Thus, "to survive summary judgment the plaintiff must show that a reasonable jury could conclude from all of the evidence that the adverse employment decision was made for a discriminatory reason." Lathram v. Snow, 336 F.3d 1085, 1088 (D.C. Cir. 2003). And "in some instances, . . . the fact that there are material questions as to whether the employer has given the real explanation will not suffice to support an inference of discrimination." Aka, 156 F.3d at 1291.

Notwithstanding the District's objections, Kangethe has established that he suffered an adverse employment action as to the Supervisory Labor Economist position.[1] He applied for the first posting of this position (No. 10572), did not apply for the second (No. 11294), but did apply for the third (No. 13183), over the course of more than a year. It is undisputed that he is qualified for the position. The District's main contention is one of semantics: that because the position was cancelled, Kangethe lost out to no one.

---

[1] The District specifically argues that Kangethe has not established a prima facie case. As noted above, however, the Court need not evaluate that question. The District's arguments still implicate, however, the issue of adverse employment action—a threshold question under even the Brady scheme. See Baloch v. Kempthorne, 550 F.3d 1191, 1196 (D.C. Cir. 2008) (addressing adverse action question before evaluating evidence as to whether employer's asserted non-discriminatory reason was pretextual).

But the <u>McDonnell Douglas</u> framework is not meant to be so rigid that an employer might easily circumvent it with formalistic distinctions. <u>See</u> <u>Stella</u>, 284 F.3d at 144–45. True, Kangethe was never formally rejected. But after he applied to the first posting—and was deemed qualified—the District posted the position twice more. Even if the posting numbers changed, the situation did not: the District "continued to seek applicants from persons of complainant's qualifications." <u>McDonnell Douglas</u>, 411 U.S. at 802; <u>see also</u> <u>Carter v. George Wash. Univ.</u>, 387 F.3d 872, 883 (D.C. Cir. 2004) (finding that plaintiff's "claim does not fail based on <u>McDonnell Douglas</u>'s fourth element" where "the position not only remained unfilled, but, as shown by [defendant's] later efforts to bring back the former employee, the [defendant] still needed someone to occupy the position"). Kangethe has thus demonstrated an adverse employment action.[2]

The District proffers a reasonable nondiscriminatory reason for declining to act on Kangethe's application: the desire to choose between a group of qualified applicants, rather than simply accepting the only applicant before it. As Joseph Walsh, the director of DOES at the relevant time, explained, "there was a whole series of folks the positions [sic] that we had opened up that came up with either zero qualified applicants or only one qualified applicant. And what I said to Human Resources is I didn't want to look at positions that had zero applicants or only one applicant because that . . . was a failure, I thought, on the part of our Human Resources process to be able to recruit candidates." Ex. C at 6. Walsh averred that he refused to even "look at the packets" resulting from such a search, and that he "wouldn't have taken any action on the position if . . . there was only one eligible candidate." <u>Id.</u> at 7. That legitimate, non-discriminatory explanation satisfies the District's burden.

---

[2] This determination renders Kangethe's spoliation argument, such as it is, moot. Thus, the Court need not evaluate whether the District acted in accordance with appropriate policies when it failed to preserve Kangethe's application for more than the standard two years.

At this point, the burden then shifts again to Kangethe, who must undermine Walsh's explanation—and here, his case falls apart.   Kangethe does not offer direct evidence of discrimination.  Nor does he demonstrate that Walsh behaved differently when other searches for other positions resulted in only one candidate.  Cf. Barnette v. Chertoff, 453 F.3d 513, 518 (D.C. Cir. 2006) (noting that "suspicious hiring practices, together with statistical and anecdotal evidence of discrimination, were sufficient to create an inference of pretext").  Instead, he simply asks the Court to discredit Walsh's statement.

Kangethe does point out that, in failing to hire anyone as Supervisory Labor Economist, DOES risked the government deobligating the funds for that position, which was a prospect that made the department "very concerned."  Ex. C-1 to Pl.'s Reply [ECF No. 58-1] at 79.  Kangethe seems to suggest that, presented with use-it-or-lose-it money, only malignant intentions could motivate an employer to forego funding by passing up an undisputedly qualified candidate.  That argument is not without some resonance.  But Kangethe "has created only a weak issue of material fact as to whether the employer's explanation is untrue."   Aka, 156 F.3d at 1291. Despite the threat of losing funding, "there were a good number of positions that [DOES] just never w[as] able to fill"—not only the one Kangethe applied for.  Ex. C at 8.  In the absence of further evidence, then, Kangethe "presents no admissible evidence from which a reasonable jury could infer that [DOES's rationale] was pretextual," Carter, 387 F.3d at 880, however much it might disagree as a matter of business.  See Stewart v. Ashcroft, 352 F.3d 422, 430 (D.C. Cir. 2003) ("This Court will not reexamine governmental promotion decisions where it appears the Government was faced with a difficult decision between two qualified candidates, particularly

where there is no other evidence that race played a part in the decision."). Thus, the District is entitled to summary judgment.[3]

As to the later position[4]—Associate Director for Labor Market and Workforce Research and Analysis—Kangethe has not produced any evidence, much less sufficient evidence, for a jury to find that DOES's decisions were discriminatory. The first posting (No. 17538) was cancelled. The second (No. 18016) required five years of "specialized experience in supervisory or project coordination assignments." Ex. A at 104. Human Resources determined that Kangethe did not meet that requirement. See id. at 6; 104. Kangethe has produced no evidence that this determination is incorrect; indeed, his own application fails to highlight a full five years of supervisory experience. See id. at 100. And as to the third posting (No. 19401), Kangethe did not apply until after Rainer had already accepted the offer, and hence the position was no longer available. Compare Ex. P at 15 with id. at 8. Thus, Kangethe has failed to "establish that his rejection was not based on the two most common legitimate reasons on which an employer might rely to reject a job applicant: an absolute or relative lack of qualifications or the absence of a vacancy in the job sought." Stewart, 352 F.3d at 428 (internal quotation marks omitted).

Even if Kangethe had been qualified for an available position, he would be hard-pressed to undermine the District's hiring decision. Rainer appears eminently qualified, with over ten years of supervisory experience. See Ex. A at 116. And the District put forth ample evidence explaining its reluctance to promote Kangethe in any event. Former DOES Deputy Director of Policy James Moore expressed concern about Kangethe's writing abilities, see Ex. H to Def.'s

---

[3] Kangethe does not seem to argue that his temporary experience in the position renders DOES's failure to hire him permanently even more suspicious. But it would not have gotten him very far: this Circuit has "admonished [a] district court for second-guessing the [employer's] decision to pass over the plaintiff in favor of another applicant notwithstanding that the plaintiff had previously served in the position he sought in an acting capacity and the selectee had not." Barnette, 435 F.3d at 518.

[4] Kangethe mentions an Associate Director of Policy, Legislative, and Statistical Analysis position, and complains that Moore was interviewed for that role. But as Kangethe has never presented evidence that he applied for that position, he cannot demonstrate an adverse employment action regarding that position.

Mot. [ECF No. 49-8] at 12, and pointed out that during Kangethe's tenure as acting supervisor, the federal government considered taking over the program because of its poor performance, see Ex. H-1 to Pl.'s Reply [ECF No. 58-2] at 18.  Moore also noted that other members of the DOES staff complained about Kangethe's leadership.  See id. at 74–76; see also Ex. F to Def.'s Mot. [ECF No. 49-6] at 4.  These are legitimate concerns, and Kangethe provides no evidence to rebut them.

## III.   RETALIATION

Retaliation claims proceed along similar lines.  "To state a prima facie case of retaliation . . . the plaintiff must establish that (1) he engaged in a statutorily protected activity, (2) the employer took an adverse personnel action, and (3) a causal connection existed between the two."  Forkkio v. Powell, 306 F.3d 1127, 1131 (D.C. Cir. 2002).  If the plaintiff establishes such a prima facie case, "the claim proceeds through the McDonnell Douglas analytical framework, ultimately to whether the defendant has presented a legitimate non-discriminatory reason for its actions and whether plaintiff has rebutted that explanation with a showing that it is a pretext for discrimination."  Lester, 290 F. Supp. 2d at 33.  Here, too, the Court need evaluate only that ultimate question.  See Nurriddin v. Bolden, --- F. Supp. 2d ---, 2014 WL 1648517, at *8 (D.D.C. Apr. 25, 2014) (noting that, under Brady, "the district court should immediately proceed to the ultimate issue of discrimination or retaliation").

Kangethe's retaliation claims, insofar as they replicate his failure-to-hire complaints, "fare[] no better."  Lester, 290 F. Supp. 2d at 33; see also Carter, 387 F.3d at 881.  And his other complaints comprise little more than the minor inconveniences of any workplace, such as a secretarial snafu that accidentally denied Kangethe sick leave—and that was "immediately" remedied.  Ex. H at 5.  Or the time he was orally reprimanded for—admittedly—failing to follow his supervisor's formatting directions.  See Ex. T to Pl.'s Opp'n [ECF No. 51-6] at 50.

Kangethe's declining performance evaluations and proposed suspension are, of course, more serious. But DOES's well-documented concerns about his performance suggest that legitimate, rather than pretextual, reasons supported those actions. He has failed to proffer any evidence suggesting otherwise.

More substantial is Kangethe's complaint that he never received back pay for his time as Acting Chief. But Kangethe does not rebut the District's point that his informal designation as Acting Chief "did not adhere to proper procedures for a temporary promotion in accordance with the D.C. Personnel Manual" and thus his new role was not eligible for a pay raise. Ex. A at 3. And he could hardly argue that the District's failure to use proper procedures for that designation was a retaliatory act in itself, as his appointment as Acting Chief preceded the events of which he now complains. Similarly, Kangethe's temporary promotion was scheduled to end in November 2009 from the moment he was appointed; the expiration of the promotion, then, is clearly not retaliatory. See id. at 4, 15. In short, Kangethe puts forth no evidence to suggest a causal connection between these incidents and his protected activity, much less anything that could reveal the District's explanations to be pretextual.

IV.     HOSTILE WORK ENVIRONMENT

Finally, a hostile work environment claim requires a plaintiff to "show that his employer subjected him to discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Baloch, 550 F.3d at 1201 (internal quotation marks omitted). In making this determination, "the court looks to the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance." Id.

Kangethe's hostile work environment claims fail because he has not demonstrated that any of the District's actions were discriminatory.  And his complaints about a tense work environment are similarly unavailing: the "standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a general civility code." Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) (internal quotation marks omitted).  Moreover, the evidence before the Court suggests that a great deal of the tension Kangethe complains of is directed by him, not at him.  In one e-mail exchange, for instance, Rainer lays out, in neutral language, the requirements for an assignment—and Kangethe responds by informing his boss that "[a] long narrative on how I should perform the task is not necessary."  Ex. W to Pl.'s Opp'n [ECF No. 51-7] at 31.  In another exchange, Rainer reiterates a request that Kangethe had failed to fulfill on time.  Disagreeing with Rainer's premise, Kangethe replied: "I will appreciate it if you do not send me any more emails on this matter again.  Your nagging on trivial matters has a desired effect of minimizing the importance of my contribution . . . ."  Ex. L to Pl.'s Opp'n [ECF No. 51-1] at 37.  Kangethe presents these e-mails as evidence of workplace "bullying," but it is unclear that he is the target of harassment at all, let alone the type of "severe or pervasive" intimidation or insult that is required to demonstrate an abusive working environment.

The most Kangethe can point to is an e-mail from Rainer, which ascribes Rainer's preference for traditional formatting to the fact that Rainer needs to "catch up with modernity," as he has been "going to opera houses and visiting third-world countries where traditions rule. ☺"  Ex. W at 19.  Taken in the context of the e-mail chain, it is unfathomable that this statement is directed at Kangethe.  And even if it were, one isolated e-mail is not "severe" or "pervasive" enough to create a hostile work environment.  On this claim, too, then, the District merits summary judgment.

**<u>CONCLUSION</u>**

For the foregoing reasons, the Court will grant the District's motion for summary judgment and deny Kangethe's.  A separate Order will issue on this date.

/s/
_____
JOHN D. BATES
United States District Judge

Dated:  <u>December  15, 2014</u>